UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                              Case Number: 17-cr-20172

v.

                              Honorable Thomas L. Ludington

JERMAINE LEON HOUSTON,

        Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS,
SUPPRESSING EVIDENCE, AND ESTABLISHING SCHEDULING ORDER**

    On January 18, 2017, Defendant Jermaine Leon Houston was stopped after two Michigan State Troopers observed him walking on 10th Street in Saginaw, Michigan, instead of walking on the abutting sidewalk, as required by state law. After asking Houston if he could pat him down, the Troopers discovered a magazine on Houston's person, and a pistol on the ground nearby. As a result, on March 22, 2017 the grand jury issued an indictment charging Defendant Houston with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). *See* ECF No. 18. On April 3, 2017 Defendant Houston moved to suppress evidence of the magazine and gun, as well as statements he made to the Troopers. *See* Mot. Suppress, ECF No. 18. For the reasons stated below, Houston's motion will be granted, and the evidence will be suppressed.

**I.**

    Defendant Jermaine Leon Houston was born on May 23, 1976, and was 40 years old on the date of the relevant events. When in school Houston attended special education classes, and

he proceeded only as far as the tenth grade. *See* Comer Tr. 3. The evidence presented by Defendant demonstrates that Houston has a long history of mental illness, has been diagnosed with major depressive disorder, impulse disorder, and unspecified developmental disorders of scholastic skills, and suffers from various substance abuse disorders. In October of 2012 Houston was assessed as having a Global Assessment of Functioning ("GAF") of 50. *See* ECF No. 25. He received treatment and counseling for these conditions as recently as January 25, 2017. *See* ECF No. 27. As a result of these conditions, Houston received social security disability income. *See* Comer Tr. 2. Houston also has a criminal history that includes carrying a concealed weapon and domestic violence. At the time of the events at issue Houston resided with his mother, Dorothy Comer, on Janes Avenue in Saginaw, Michigan.

**A.**

In the early morning hours of January 18, 2017, Michigan State Troopers Tyler Schuiteman and Clint Korpalski were on patrol in a marked car in the City of Saginaw. When traveling down South 10th Street, the Troopers observed a male walking in the roadway where sidewalks were provided. Under Michigan Compiled Law 257.655, "[w]here sidewalks are provided, a pedestrian shall not walk upon the main traveled portion of the highway. Where sidewalks are not provided, pedestrians shall, when practicable, walk on the left side of the highway facing traffic which passes nearest." Mich. Comp. Law 257.655(1). "A person who violates this section is responsible for a civil infraction." Mich. Comp. Law 257.655(2). At the motion hearing held on May 15, 2017 and continued on May 23, 2017, the Troopers identified the male as Defendant Houston. *See* Schuiteman Tr. 5-8, Korpalski Tr. 4-5.

After the Troopers drove towards Defendant Houston, Houston moved onto the sidewalk. *See* Schuiteman Tr. 6-7, Korpalski Tr. 5. After they followed him for an additional 20 yards or so, Defendant walked up a driveway of a residence on 10th Street. *Id*. Unbeknownst to the Troopers, Houston was only about a half of a block away from his mother's house. *See* Comer Tr. 1-2. Also unbeknownst to the Troopers, the residence was inhabited by Defendant's Godmother, Janice Peterson West. *See* West. Tr. 1.

Defendant Houston did not attempt to enter the residence. Instead, he walked from the driveway into the backyard. The Troopers responded by shining the spotlight of their patrol car into the backyard of the residence, where they observed Houston standing near a fence on the south side of the residence. *See* Schuiteman Tr. 7. The Troopers then asked Houston to come out from behind the house so that they could speak with him. *See* Schuiteman Tr. 10, Korpalski Tr. 6, 18. Houston did as he was asked, and approached the Troopers' vehicle. *Id*. Trooper Korpalski then exited the vehicle to speak with Houston.

Upon making contact with Houston, Trooper Korpalski did not ask for identification. Trooper Korpalski testified that he first asked Houston whether he had anything illegal on his person, to which Houston replied that he did not. *See* Korpalski Tr. 19. Trooper Korpalski then testified that he asked Houston if he could conduct a search of his person, to which Houston allegedly consented. *Id*. Korpalski did not recall the specific words or phrasing he used in requesting consent for the search. *Id*. Upon conducting the search, Korpalski discovered a loaded 9-millimeter magazine in Houston's front right jacket pocket. *Id*. at 8, 21. Trooper Korpalski then handcuffed Houston, detained him, and placed him in the back of the patrol car. *Id*.

After Houston was detained, Trooper Schuiteman went into the backyard of the residence to search for any other contraband or weapons. *See* Schuiteman Tr. 11. After Trooper Schuiteman failed to locate anything, Trooper Korpalski began a search of the backyard. Trooper Korpalski eventually discovered a 9-millimeter pistol on the south side of the residence along the fence line, where Houston had previously been standing. *See* Korpalski Tr. 9. Trooper Korpalski testified that the gun matched the type of magazine found on Houston's person. *Id*. Korpalski proceeded to photograph the weapon and secure it in the patrol vehicle. *Id*.

The Government has provided the Court with a disk containing audio and visual of the events that took place inside the patrol car as the Troopers drove Houston to the Saginaw County Jail. The video shows that Trooper Schuiteman was in the driver's seat, Trooper Korpalski was in the passenger's seat, and Defendant Houston was in the back of the patrol car. The video also demonstrates that Houston was "very emotional" immediately following his arrest, sobbing and wailing in the back of the car. *See* Schuiteman Tr. 24. While the audio is difficult to discern, Trooper Korpalski read Houston his Miranda rights at the outset of the encounter. During the hearing both Troopers testified that this was the content of the initial exchange. *See* Schuiteman Tr. 13, Korpalski Tr. 22. When Korpalski initially asked Houston if he understood his rights, Houston did not respond, but instead continued to wail. Over the next few minutes, Korpalski repeated the question multiple times. Eventually, the Troopers testified that Houston responded by saying "yes", "all right," or "yeah." *See* Schuiteman Tr. 24; Korpalski Tr. 12. Again, the audio of this exchange is extremely difficult to discern. During the course of the following conversation Houston calmed down, and acknowledged that he had possessed the gun, explaining that he had recently been robbed and was scared. *See* Korpalski Tr. 13. He further

admitted that the gun belonged to his sister, that he took it without her knowledge, and that he knew he was not supposed to possess any firearms. *Id*. *See also* Schuiteman Tr. 22.

The Troopers then ran a LIEN report, which led to the discovery that there was valid warrant for Houston's arrest for failure to pay child support. *See* Schuiteman Tr. 22-23. From the record, it seems that this is the time when the Troopers first became aware of the warrant. It is unclear whether any prosecution was pursued related to that warrant. The video ends when the vehicle arrives at the Saginaw County Jail.

Trooper Schuiteman testified that Houston was primarily placed under arrest for "further investigation for any kind of CCW case or felon in possession of a firearm and whatnot." *See* Schuiteman Tr. 22. He testified to his belief that Houston placed the Troopers on notice of the potential violations at the scene of the incident, where Houston informed them that he had just gotten out of prison for some gun cases. *Id*. at 21. However, Trooper Schuiteman also testified that they only learned of Houston's criminal history after he was taken to the jail. *Id*.

**B.**

On March 22, 2017 the grand jury issued an indictment charging Defendant Houston with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). *See* ECF No. 18. On April 3, 2017 Defendant Houston moved to suppress evidence of the magazine and gun, as well as statements he made to the Troopers. *See* Mot. Suppress, ECF No. 18. In support of his motion to suppress, Defendant Houston raises three arguments. First, he argues that the sidewalks on 10th Street were rendered impassable due to snow and ice, and were thus "not provided" for the purpose of Michigan Compiled Law 257.655. Second, Houston argues that he did not give voluntary, intelligent consent to the pat-down search. Third and finally,

Houston argues that statements he made to the Troopers in the patrol car should be suppressed because he did not knowingly and voluntarily waive his *Miranda* rights. *See Miranda v. Arizona,* 384 U.S. 436 (1966).

An evidentiary hearing on Defendant's motion commenced on May 15, 2017. The hearing was continued on May 23, 2017 because Trooper Korpalski was unavailable on the initial date. At the close of the hearing on May 23, 2017, the Court ruled that the initial stop of Houston for violating Michigan Compiled Law 257.655 was justified. However, the Court noted that the issue of whether the pat-down search of Houston was justified was a closer question. Defense counsel requested that the Court refrain from reaching a final decision until after she was able to locate certain documents regarding Defendant Houston's mental status. The hearing was therefore again continued on May 30, 2017.

On that date, Defense counsel noted that she had been able to locate medical records regarding Houston's mental state, and the parties stipulated to the admission of the records as exhibits. The Court also directed the parties to submit supplemental briefs addressing the legality of the pat-down search of Defendant, and the proper remedy in the event that the search was found to be illegal. Defendant was directed to file a supplemental brief on or before June 6, 2017, and the Government was directed to file a supplemental response on or before June 13, 2017. While the Court has received Defendant's supplemental brief, the Court did not receive any response from the Government. *See* ECF No. 26.

**II.**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons … against unreasonable searches and seizures." U.S. Const. Amend. IV. The Supreme Court has

identified three kinds of reasonable, permissible, and warrantless encounters between the police and citizens: (1) consensual encounters in which a police officer initiates contact and asks questions without any objective level of suspicion; (2) investigative detentions, otherwise known as *Terry* stops, which must be predicated upon reasonable suspicion of criminal activity; and (3) arrests, which must be supported by probable cause. *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010). Although the Fourth Amendment is not implicated by purely consensual encounters all other seizures (investigative detentions and arrests) receive Fourth Amendment protection. *Id.* at 535. Through his motion to suppress, Houston challenges the legality of each stage of his encounter with the Troopers.

**A.**

As noted on the record, Houston's first argument – that the Troopers did not have probable cause to believe that he had committed a civil infraction – is without merit. "In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). A determination of probable cause is fact-dependent, and turns on "what the officer knew *at the time he made the stop*." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (emphasis in original). The relevant question is whether the Troopers had "a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion" that Houston committed a civil infraction. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). Resolution turns not on whether a reasonable officer *would* have stopped the suspect, or indeed *could* have stopped the suspect, "but on whether this particular officer in fact had probable cause to believe that a [civil infraction] had occurred, regardless of whether this was the only basis or

merely one basis for the stop." *Ferguson*, 8 F.3d at 391. The officer's subjective intent for making the stop is irrelevant. *Whren v. United States*, 517 U.S. 806, 813 (1996).

The evidence presented at the hearing demonstrates that the sidewalk in question had been cleared and salted on the relevant date. The Troopers' belief that the sidewalk was passable was therefore reasonable. The evidence also demonstrated that Houston was viewed walking in the center of the road instead of on the left side. Where sidewalks are not provided, the relevant Michigan statute requires pedestrians, "when practicable, [to] walk on the left side of the highway facing traffic which passes nearest." Michigan Compiled Law 257.655. The Troopers therefore had probable cause to believe that Houston had committed a civil infraction, and were therefore justified in making the initial stop of Houston.

**B.**

The primary issue before the Court is whether the Troopers exceeded the scope of their authority in conducting a pat-down search of Houston. During the course of the hearing the Government asserted two legal bases for the pat-down search. First, the Government argued that the Troopers had authority to search Houston's person for weapons pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny. Second, the Government argued that Houston gave knowing and voluntary consent to the search. As noted above, the Government did not file any supplemental brief developing these arguments despite the opportunity to do so. Even so, each argument will be addressed in turn.

**i.**

*Terry* holds that, under the Fourth Amendment, an officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is

afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). An officer may also perform a "frisk" or "pat down" search whenever the officer has reasonable suspicion that the suspect is armed *and* dangerous. *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). "Reasonable suspicion is based on the totality of the circumstances." *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016). "Ultimately, the test is whether 'a reasonably prudent person in the circumstances would be warranted in the belief that his or her safety or that of others was in danger.' " *Id*. (citing *United States v. Noble*, 762 F.3d 509, 522 (6th Cir. 2014)). This standard is an objective one. *See Terry,* 392 U.S. at 22. It "requires more than a mere hunch," instead demanding "a particularized and objective basis for suspecting that *the particular person* is armed and dangerous." *Noble*, 662 U.S. at 522 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)) (additional citations omitted). The Supreme Court has cautioned that "[n]othing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or indeed, any search whatever for anything but weapons." *Ybarra v. Illinois*, 444 U.S. 85, 93-94 (1979).

At the evidentiary hearing, the Troopers testified that, prior to the pat down search, they had reason to believe Houston had committed a civil infraction for walking down the center of a street where a sidewalk was provided. *See* Schuiteman Tr. 6. The Troopers also testified that they believed that Houston attempted to avoid contact with them by entering the yard of a residence, which, according to Troopers Schuiteman, "did not seem normal per se." *See* Schuiteman Tr. 8. Trooper Korpalski, for his part, testified that "[u]sually when people see the police, if they're not doing anything wrong they don't – they wouldn't try to hide in[] a backyard when we try to make contact with them." *See also* Korpalski Tr. 5. Finally, Trooper Korpalski testified that the incident took place in a neighborhood that had a reputation for being unsafe and

violent in the evening hours. *See* Korpalski Tr. 13, 24. The evidence did not demonstrate that the Troopers were aware of Houston's criminal history or his outstanding warrant at the time of the search, and there is no testimony suggesting that Houston otherwise appeared dangerous. Trooper Korpalski specifically testified that he had no reason to believe that Houston has been involved in any violent conduct or had any gang affiliation. *See* Korpalski Tr. 14-15.

Altogether, the evidence amounts to allegations that Houston failed to use the sidewalk when walking by himself in a dangerous neighborhood late at night, and then attempted to avoid contact with police by walking into the backyard of a house. While these facts could give rise to a reasonable suspicion that criminal activity was afoot – as would justify the initial stop – they do not give rise to a reasonable suspicion that Houston was armed and dangerous – as would justify the subsequent search. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Instead, the search appears to be an impermissible, generalized cursory search. *See Ybarra*, 444 U.S. at 94. Because the Troopers did not have individualized, reasonable suspicion that Houston was both armed and dangerous at the time of the search, the search was not justified under *Terry*.

**ii.**

Because the Troopers did not have reasonable suspicion that Houston was armed and dangerous, the search of his person was only proper if they obtained his consent. It is well-settled that a person may waive his Fourth Amendment rights by consenting to a search. *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004). Consent to a search "may be in the form of words, gesture, or conduct." *Carter*, 378 F.3d at 587 (quotation and citation omitted). "In whatever form, consent has effect only if it is given freely and voluntarily." *Id.* "The government bears the burden of demonstrating by a preponderance of the evidence, though clear

and positive testimony … that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009) (internal quotation marks and citations omitted). Whether these requirements are met is a question of fact to be determined from the totality of all the circumstances. *Id*. Relevant factors include "the age, intelligence, and education of the suspect; whether the suspect understands the right to refuse consent; the length and nature of the detention; the use of coercive or punishing conduct by the police; and indications of more subtle forms of coercion that might flaw the suspect's judgment." *United States v. Cochrane*, 702 F.3d 334, 342 (6th Cir. 2012) (internal quotations omitted).

At the hearing, Trooper Korpalski testified that he asked Houston for consent to search his person, and that Houston so consented. *See* Korpalski Tr. 8. On cross-examination Korpalski testified that he did not use the word "consent" in asking for permission to perform the search, but otherwise did not recall how he phrased the question to Houston. *Id*. at 19. However, in response to later questioning by the Court Trooper Korpalski testified, "I asked him if he had anything illegal on his person, to which he stated no. I then asked, would you mind if I checked, and he stated, no, go ahead." *Id*. at 27-28. Trooper Schuiteman recalled that a conversation took place between Houston and Trooper Korpalski, but could not remember the content of the exchange. *See* Schuiteman Tr. 26. The Troopers did not obtain any written consent from Houston, and there is no other writing documenting the exchange. *Id*.

The Government has not met its burden of demonstrating through clear and positive testimony that Houston's consent was "voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *Canipe*, 569 F.3d at 602. Instead, the evidence reflects

that, at best, Troopers Korpalski requested Houston's consent in curt and ambiguous terms. The exchange occurred in a coercive circumstance, as the two Troopers stopped Houston when he was alone at night, tailed him for a time, and eventually confronted him using a floodlight. Finally, Houston's intelligence, education, GAF score, and mental health history suggest that he did not understand the right to refuse consent. All these factors together demonstrate that Houston's purported response was not voluntary, and that it could not form the legal basis of the pat-down search.

## C.

Because the Troopers did not have any legal basis to conduct the pat-down search of Houston, the evidence discovered pursuant to that search must be suppressed. The Government has not raised any argument that the magazine, the gun, or Houston's incriminating statements were discovered "by means sufficiently distinguishable to be purged of the primary taint," *Wong Sun v. United States,* 371 U.S. 471, 486 (1963), or that any of the evidence would have been inevitably discovered from an independent source. *See Nix v. Williams*, 467 U.S. 431, 444 (1984). The Government also has not argued that the *Miranda* warning provided to Houston by the Troopers was sufficiently attenuated from the unlawful search to break the chain of causation. *See Brown v. Illionois*, 422 U.S. 590, 603 (1975) ("Miranda warnings, alone and per se, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession."). The Government has therefore waived these arguments.

The Government appears to rest on the Troopers' testimony, which demonstrates that they only decided to search for a gun after discovering the magazine. *See* Korpalski Tr. 9

("Having a magazine on your person, to me that means that you had or have a gun; you don't carry a pistol magazine without having a pistol."). The Troopers' testimony further demonstrates that they were unaware of Houston's criminal history and his outstanding warrant at the time he was taken into custody. As Trooper Schuiteman testified, Houston was arrested based on the discovery of the magazine and pistol and Houston's subsequent statements regarding his criminal record. Trooper Schuiteman further testified that Houston was arrested for "further investigation for any kind of CCW case or felon in possession of a firearm and whatnot." *See* Schuiteman Tr. 22. The Government thus has not demonstrated sufficient attenuation to break the connection between the illegal search and the later discovered evidence. *See Taylor v. Alabama*, 457 U.S. 687, 687 (1982).[1] Houston's motion to suppress will be granted.

## II.

Accordingly, it is **ORDERED** that Defendant Houston's motion to suppress, ECF No. 18, is **GRANTED.**

It is further **ORDERED** that evidence of the magazine, pistol, and Houston's subsequent statements are **SUPPRESSED**.

---

[1] Because Houston's motion will be decided on these grounds, and because the Government has not argued that the *Miranda* warning was both valid and sufficiently attenuated form the unlawful search, there is no need to address Houston's additional argument regarding whether he knowingly and voluntarily waived his *Miranda* rights.

It is further **ORDERED** that the scheduling order is **ADJOURNED** as follows:

    Plea due:                         **August 7, 2017**

    Final Pretrial Conference:     **August 14, 2017 at 3:00 p.m.**

    Jury Trial:                        **August 29, 2017 at 8:30 a.m.**

Dated: July 11, 2017                                s/Thomas L. Ludington
                                                              THOMAS L. LUDINGTON
                                                               United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 11, 2017.

                               s/Kelly Winslow
                               KELLY WINSLOW, Case Manager